237 P.3d 263 (2010)
Cal Coburn BROWN and Jonathan Gentry, Appellants,
v.
Eldon VAIL, Secretary of Washington Department of Corrections (in his official capacity); Stephen Sinclair; Marc Stern; Cheryl Strange; Washington State Department of Corrections, and Does 1-50, Respondents.
Darold Stenson, Appellant,
v.
Eldon Vail, Secretary of Washington Department of Corrections (in his official capacity); Stephen Sinclair; Marc Stern; Cheryl Strange; Washington State Department of Corrections, and Does 1-50, Respondents.
Nos. 83474-1, 83828-3.
Supreme Court of Washington, En Banc.
Argued March 18, 2010.
Decided July 29, 2010.
*264 Sherilyn Christine Peterson, Perkins Coie, L.L.P., Diane Marie Meyers, Graham & Dunn, Seattle, WA, for Appellants.
*265 Sara J. Di Vittorio, John Joseph Samson, Office of the Attorney General, Olympia, WA, for Respondents.
Sarah A. Dunne, Nancy Lynn Talner, ACLU of Washington Foundation, Beth Marie Andrus, Skellenger Bender PS, Seattle, WA, amicus counsel for ACLU of Washington Foundation.
Scott Jeffrey Engelhard, Suzanne Lee Elliott, Gilbert Henry Levy, Attorneys at Law, Seattle, WA, amicus counsel for Interested Parties.
STEPHENS, J.
¶ 1 This case began mainly as a constitutional challenge by three death row inmates, Darold Stenson, Cal Brown, and Jonathan Gentry (Appellants), to Washington's three-drug lethal injection protocol for carrying out a sentence of death. The Thurston County Superior Court dismissed some claims on summary judgment and held a five-day bench trial in May 2009 to consider whether the three-drug protocol violated the Eighth Amendment prohibition against "cruel and unusual punishment" or Washington's constitutional ban on "cruel punishment" in article I, section 14. The trial court upheld the lethal injection protocol, and this appeal followed.
¶ 2 Before this court heard oral argument, however, the Washington Department of Corrections (Department) abandoned the three-drug method of execution and adopted a new, one-drug protocol, effective March 8, 2010. The Department now moves to dismiss the Appellants' constitutional challenge as moot, leaving for review only claims concerning the legislative delegation of authority to the Department to develop a lethal injection protocol, and the Department's handling of the lethal injection substances under state and federal law governing controlled substances. In addition, the Department cross-appeals the trial court's refusal to dismiss this case as time barred.[1]
¶ 3 For the reasons that follow we affirm the trial court, both as to the statute of limitations question and its dismissal of the claims concerning legislative delegation and the state and federal controlled substances acts. With respect to the Appellants' constitutional challenge and related claims, we grant the Department's motion to dismiss these claims as moot.

FACTS AND PROCEDURAL HISTORY
¶ 4 The Appellants in this matter were sentenced to death following murder convictions. In this civil action, they challenge the Department's protocol for carrying out a death sentence by lethal injection. Below and in their initial briefs in this court, the Appellants did not challenge the imposition of the death penalty generally or the use of some lethal injection protocol to impose death; rather, their claim focused on the particular three-drug protocol the Department followed. See Opening Br. of Appellant Stenson at 25 (Br. of Appellants) (arguing one-drug execution method is preferable).[2]

A. Procedural History
¶ 5 In September 2008, Stenson brought an action against the Department challenging the adequacy of the Department's lethal injection policy under the state and federal constitutions. Br. of Appellants at 7. He also alleged the Department lacked a proper delegation of legislative authority to develop the policy. See Clerk's Papers (CP) at 3381 (dismissing claim on summary judgment). In 2009, Brown and Gentry brought a separate action, which was later consolidated with Stenson's. Opening Br. of Resp'ts/Cross-Appellants (Br. of Resp'ts) at 10-11. Upon consolidation, Brown and Gentry agreed to *266 pursue only their constitutional challenge and dismiss for trial their claims that the Department lacked legislative authority to develop the protocol and that the Department's handling of the lethal injection substances violated the federal controlled substances act. Id. Brown and Gentry did not waive their right to appeal the pretrial dismissal of those claims. Id. at 11.
¶ 6 In April 2009, Stenson filed a second amended complaint seeking a declaratory judgment and injunctive relief to enjoin the Department from carrying out executions under the 2008 lethal injection protocol, as written and as implemented by the Department. CP at 1148-66. The complaint alleged that the protocol violates the Appellants' rights under the Eighth Amendment to the United States Constitution and article I, section 14 of our state's constitution. The complaint also alleged the protocol violates the state and federal controlled substances acts. CP at 1165.
¶ 7 Prior to trial, the Appellants unsuccessfully moved for a preliminary injunction in order to get a temporary stay of execution. CP at 558-61. That decision was appealed to this court, which entered a temporary stay of execution. Wash. Supreme Court Order, Brown v. Vail, No. 82832-6 (Mar. 12, 2009).[3] The Appellants request for permanent injunctive relief on the basis of various alleged constitutional and statutory violations proceeded to a trial on the merits.
¶ 8 Before trial, having already dismissed the Appellants' unlawful delegation claim, the trial court additionally granted summary judgment dismissal of the Appellants' claim regarding the alleged violation of the state and federal controlled substances acts. CP at 2941-42.
¶ 9 A bench trial commenced on the remaining constitutional claims on May 21, 2009 and lasted five days. At its conclusion, the trial court ruled in favor of the Department. CP at 3191-207 (Findings of Fact and Conclusions of Law); Br. of Appellants, Ex. 4 (appending trial court's findings of fact and conclusions of law).
¶ 10 The Appellants appealed directly to this court, and we retained the matter, setting oral argument for March 18, 2010. On March 4, 2010, the Department filed a motion to dismiss as moot the claims that the three-drug protocol is unconstitutional. The Department represented that it was poised to adopt a new protocol allowing for execution by a single dose of sodium thiopental, rather than the three-drug combination, which it argued would render the Appellants' constitutional claims moot. On March 8, 2010, the Appellants filed a response to the Department's motion, arguing that even if this court were to find the Appellants' constitutional claims moot, "that would not necessarily require their dismissal, but might instead call for further proceedings to assess the constitutionality of the amended policy" under the state and federal constitutions. Pet'rs' Resp. to Resp'ts' Mot. to Dismiss as Moot the Claims that the Three-Drug Protocol is Unconstitutional at 7 (Resp. to Mot. to Dismiss as Moot). That same day, on March 8, 2010, the Department officially adopted the one-drug protocol. On March 9, 2010, the court entered an order passing the Department's motion to dismiss to the merits.

B. The Death Penalty Protocol
¶ 11 The Department implements the death penalty through a written policy, DOC 490.200, to which the Department makes periodic revisions. Br. of Appellants at 5. The secretary of the Department must approve changes. Id. In one revision, the Department established a three-drug protocol for lethal injection to be administered in the following order: sodium thiopental, pancuronium bromide, and potassium chloride. CP at 3425 (1998 version of protocol). This protocol was revised in 2008 following the United States Supreme Court opinion in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 1532, 170 L.Ed.2d 420 (2008) (upholding Kentucky's three-drug protocol against an Eighth Amendment challenge). I Verbatim Report of Proceedings (VRP) at 71.
¶ 12 As noted, when we retained review in this case, the 2008 protocol was in effect and *267 the Appellants challenged this protocol as impermissible under state and federal constitutional provisions prohibiting cruel and/or unusual punishment. Under the 2008 three-drug protocol, an execution is carried out via intravenous injection of three lethal substances: sodium thiopental, pancuronium bromide, and potassium chloride. Sodium thiopental is an anesthetic that induces a deep, coma-like unconsciousness. II VRP at 272-74. The second drug, pancuronium bromide, is a paralytic agent that inhibits muscular-skeletal movements and stops respiration by paralyzing the diaphragm, therefore bringing about the death of the inmate by asphyxiation. II VRP at 275, 281. The third drug, potassium chloride, a heart attack-inducing agent, interferes with the electrical signals that stimulate heart contractions. II VRP at 276-77. Without the unconsciousness produced by the sodium thiopental, the condemned inmate would experience a very painful death as a result of the effects of pancuronium bromide and potassium chloride. II VRP at 281-82.
¶ 13 Prior to oral argument in this case, the Department amended its protocol so that a condemned inmate is now put to death with a single dose of sodium thiopental. Testimony at trial established that in large doses, roughly three grams or above, sodium thiopental will likely stop an individual from breathing. III VRP at 483. The 2010 protocol calls for the administration of a five gram dose. Resp. to Mot. for Continuance of Oral Argument, App. B at 10. For this discussion, the pertinent differences between the 2008 and 2010 protocols are that that 2010 protocol adopted the single-drug method of execution and it also expressly incorporated a checklist used by the superintendent in preparing for an execution. Id. at 1 (summary of revision/review).
¶ 14 Aside from these changes, many aspects of the 2010 protocol are similar to the 2008 protocol. For example, like the 2008 protocol, the 2010 protocol assembles an injection team that operates under the supervision of the superintendent. Trial Ex. (Tr. Ex.) 1, at 9 (2008 protocol); IV VRP at 617-18; Resp. to Mot. for Continuance of Oral Argument, App. B at 8-10 (2010 protocol). The injection team members are required to have sufficient training or experience to carry out the lethal injection process without any unnecessary pain to the inmate. Resp. to Mot. for Continuance of Oral Argument, App. B at 9; Tr. Ex. 1, at 8. Minimum qualifications include one or more years of professional experience as a certified medical assistant, phlebotomist, emergency medical technician, paramedic, military corpsman, or similar occupation. Id. The injection team positions the intravenous lines (IV) into the inmate, mixes the chemicals, prepares the syringes, and eventually injects the drugs through 14 1/2 feet of IV tubing. Id.; Tr. Ex. 1, at 9; IV VRP at 618.[4] After the inmate is brought into the execution chamber and placed on the execution table under restraints, the injection team enters the chamber to insert two IVs into the inmate and begin a flow of saline through each line. Id. The team then returns to an adjacent room behind one-way glass. Tr. Ex. 1, at 9; II VRP at 228. Upon notification from the superintendent, the team introduces the lethal solution. Resp. to Mot. for Continuance of Oral Argument, App. B at 10. The injection team signals the superintendent when all of the solutions have been administered. Id. At a time deemed appropriate by the superintendent, the curtains are closed and the superintendent calls for the physician to examine the body and make a pronouncement of death. Id.
¶ 15 During trial on the 2008 protocol, the superintendent testified that, although it was not part of the protocol as written, the Department would not use a "cutdown" procedure, wherein a vein is surgically accessed. IV VRP at 694. He also testified that, although the policy as written does not so specify, the Department would not seek to access an inmate's veins via the neck. Id. The trial court found this testimony to be credible. CP at 3196 (Finding of Fact 25). At oral argument, the Department represented that it was bound by this testimony in *268 the implementation of the 2010 protocol. Wash. Supreme Court Oral Argument, Brown v. Vail, No. 83474-1 (Mar. 18, 2010), at 32 min., 21 sec. through 33 min., 24 sec., audio recording by TVW, Washington State's Public Affairs Network, available at http://www.tvw.org.

ANALYSIS
¶ 16 As noted, this case does not present a challenge to the death penalty generally or even to all methods of lethal injection. We are asked to consider whether the Department's lethal injection protocol was drafted without legislative authority and whether the protocol violates the state and federal controlled substances acts. These claims do not turn on whether the protocol at issue employs a three-drug or one-drug execution method, and the Department does not argue they should be dismissed as moot. Thus, while the briefing in this case as to the nonconstitutional issues cites to the three-drug 2008 protocol, the arguments are equally applicable to the newly enacted 2010 one-drug protocol. We also consider whether the Appellants' constitutional claims are moot in light of the new protocol. To begin with, however, we must address the Department's cross appeal alleging that the Appellants' claims are barred by a statute of limitations.

A. Is the Appellants' challenge time barred?
¶ 17 Washington law imposes a catch-all, three-year statute of limitations for "injury to the person or rights of another not hereinafter enumerated." RCW 4.16.080(2). At trial, the Department moved to dismiss the Appellants' challenge as time barred by RCW 4.16.080(2). CP at 563. The trial court denied the motion, reasoning that "the statute of limitations period was reset when [the Department] amended its policy in June 2007 and again on October 25, 2008." Id.
¶ 18 The Department renews its argument here, asking this court to hold that the three-year statute of limitations began to run when the Appellants' sentences became final.[5] The Department points out that lethal injection has been the primary method of execution since 1996. Br. of Resp'ts at 48 (citing CP at 3423-25; I VRP at 33). Thus, the Appellants knew, or should have known,[6] since the mid-1990s that the Department would carry out their sentences using that method. Id. Under the Department's argument, the three-year statute of limitations expired nearly a decade before the Appellants filed this lawsuit in 2008.
¶ 19 The trial court properly rejected the Department's argument. The Appellants' challenge to the method of execution used in Washington State turns mainly on whether the Department's lethal injection protocol satisfies state and federal statutory and common law requirements. To make such a determination, the protocol itself must be analyzed in its most current form. The three-year statute of limitations to file a claim challenging an execution protocol amended in 2007, again in 2008, and again in 2010, did not run by the time the Appellants filed this lawsuit in 2008.
¶ 20 We hold that the Appellants' challenge to the protocol is not time barred.

B. Legislative Delegation of Authority Concerning Death Penalty Protocols
¶ 21 The Appellants contend that the legislature did not delegate to the Department the authority to make policy such as the death penalty protocol. Br. of Appellants at 27. The trial court dismissed this claim on summary judgment. CP at 3381. The Appellants do not appear to argue that there *269 are issues of material fact that the court should have reviewed, but rather that the trial court erred as a matter of law when it concluded that the Department acted with authority. Br. of Appellants at 27-30. We review the trial court's ruling de novo.
¶ 22 A proper delegation of legislative authority requires that the legislature "`provide standards or guidelines which indicate in general terms what is to be done and the administrative body which is to do it.'" In re Pers. Restraint of Powell, 92 Wash.2d 882, 891, 602 P.2d 711 (1979) (quoting Barry & Barry, Inc. v. Dep't of Motor Vehicles, 81 Wash.2d 155, 163-64, 500 P.2d 540 (1972)). In addition, "`adequate procedural safeguards must be provided, in regard to the procedure for promulgation of the rules and for testing the constitutionality of the rules after promulgation.'" Id. (emphasis omitted).
¶ 23 As to the first requirement, by statute the secretary of the Department shall manage the Department, administer correctional programs, and oversee operation of all state correctional facilities. RCW 72.09.050. The secretary "may delegate any of his or her functions or duties to department employees." Id. Moreover, the superintendent of each correctional facility, subject to approval from the director of the division of prisons and the secretary, "shall make, amend, and repeal rules for the administration, supervision, discipline, and security of the institution." RCW 72.02.045(4). Finally, "[a]ll executions ... shall be carried out within the walls of the state penitentiary," RCW 10.95.180(2), and the superintendent is charged with the supervision of punishment by death, which is to be accomplished by either hanging or "intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until the defendant is dead." RCW 10.95.180(1).
¶ 24 Pointing specifically to RCW 10.95.180, the Appellants contend that it provides merely that the superintendent will supervise the execution, with "no express delegation of authority to [the Department]." Br. of Appellants at 28.
¶ 25 The Appellants' argument fails. A delegation of authority need not be express. "Administrative agencies have those powers expressly granted to them and those necessarily implied from their statutory delegation of authority.... [I]mplied authority is found where an agency is charged with a specific duty, but the means of accomplishing that duty are not set forth by the Legislature." Tuerk v. Dep't of Licensing, 123 Wash.2d 120, 124-25, 864 P.2d 1382 (1994) (citations omitted). The Department, through the superintendent of the state penitentiary, is charged with the duty to supervise executions by lethal injection under RCW 10.95.180(1), necessarily including the authority to establish the protocol by which lethal injection will be administered. The Appellants underestimate the plain meaning of "supervise." They seem to believe the superintendent's statutory supervisory duty is one of passive observer. Br. of Appellants at 28. But "supervise" means "to coordinate, direct, and inspect continuously and at first hand the accomplishment of: oversee with the powers of direction and decision the implementation of one's own or another's intentions." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2296 (2002). Thus, the superintendent's supervisory role as to executions plainly encompasses decision-making powers about how lethal injection is to be accomplished. The legislature provided sufficient standards or guidelines about what is to be done and about which administrative body is to do it. See Powell, 92 Wash.2d at 891, 602 P.2d 711.
¶ 26 The second requirement for proper legislative delegation is that adequate procedural safeguards be present for the promulgation of rules and to test their constitutionality once promulgated. Id. Simply put, the legislature cannot delegate wholesale its obligation to declare public policy within a legislative process containing important procedural safeguards. See Diversified Inv. P'ship v. Dep't of Soc. & Health Servs., 113 Wash.2d 19, 24, 775 P.2d 947 (1989) ("The Legislature is prohibited from delegating its purely legislative functions ... [such as] the power to declare general public policy."). When reviewing whether authority has been properly delegated to an agency to promulgate *270 rules subjecting individuals to criminal sanctions, we have focused on the safeguard requirement. This requirement is satisfied where rules are promulgated pursuant to the Administrative Procedure Act (APA), chapter 34.05 RCW, and include an appeal process before the agency, or judicial review is available, and the procedural safeguards normally available to a criminal defendant remain. State v. Simmons, 152 Wash.2d 450, 457, 98 P.3d 789 (2004); State v. Crown Zellerbach Corp., 92 Wash.2d 894, 900-01, 602 P.2d 1172 (1979).
¶ 27 The Department's development of the state death penalty protocol meets this test insofar as it is applicable. The protocol is subject to judicial review, as made plain by our review of this case. Further, the protocol itself is not a criminal sanction independent of the trial and sentencing process, so the third safeguard is not implicated.[7] It is true the death penalty protocol was not promulgated pursuant to the APA and cannot be appealed before the agency, but this is not determinative of the Department's authority to draft such a policy. For one, the Department is exempt from the APA. RCW 34.05.030(1)(c) (excluding the Department from the APA "with respect to persons who are in their custody"). Moreover, the protocol is not akin to a "rule" under the APA requiring an avenue for agency review. RCW 34.05.010(16) defines "rule" as "any agency order, directive, or regulation of general applicability" that subjects a person to penalty or sanction, or relates to administrative hearings, or relates to the enjoyment of a benefit or privilege conferred by law, or relates to licensing for a commercial, trade, or professional activity, or regulates standards for the distribution or sale of materials or products. The death penalty protocol does not fall into any of these categories. The protocol itself is not an order or directive subjecting a person to a penalty or sanction, but rather a procedure for carrying out an already imposed penalty. Thus, the Department was not required to draft the death penalty protocol within the administrative rule-making process. The opportunity for judicial review and the presence of adequate safeguards during the proceedings resulting in each appellant's judgment and sentence satisfy the delegation requirement that adequate procedural safeguards underpin the agency action.
¶ 28 We hold that the Department's authorship of the protocol governing lethal injection is permitted by a legislative delegation of powers arising from RCW 10.95.180(1) and related provisions.[8]

C. Federal and State Controlled Substances Act Violations
¶ 29 Count III of the Appellants' complaint asserts that the Department's handling of the substances necessary for lethal injection violates the state and federal controlled substances acts, chapter 69.50 RCW, Washington's Uniform Controlled Substances Act (UCSA), and 21 U.S.C. §§ 801-971, the federal Drug Abuse Prevention and Control Act (DAPCA). CP at 1165. Specifically, the Appellants contend the Department is in violation of these acts because it uses sodium thiopental without a prescription as required by RCW 69.50.308(b) and 21 U.S.C. § 829.
¶ 30 In the trial court below, the Department moved for summary judgment on Count III, arguing in part that the UCSA and the DAPCA create no private cause of action. The trial court agreed and dismissed the claim. The Appellants challenge that summary judgment ruling.
¶ 31 At oral argument, the Appellants made it clear they are seeking a declaratory judgment under the Uniform Declaratory Judgments Act (UDJA), chapter 7.24 RCW, *271 that the Department's use of sodium thiopental is unlawful. Wash. Supreme Court Oral Argument, Brown v. Vail, No. 83474-1 (Mar. 18, 2010), at 17 min., 17 sec. through 19 min., 5 sec., audio recording by TVW, Washington State's Public Affairs Network, available at http://www.tvw.org. Declaratory relief requires a showing of standing, but not the existence of a private cause of action. Therefore, it is unnecessary for us to decide whether the trial court erred by holding that there is no private cause of action under the state and federal controlled substances acts.
¶ 32 Nevertheless, we decline to issue a declaratory judgment based on the alleged violations of the UCSA or the DAPCA. "`[B]efore the jurisdiction of a court may be invoked under the [UDJA], there must be a justiciable controversy.'" To-Ro Trade Shows v. Collins, 144 Wash.2d 403, 411, 27 P.3d 1149 (2001) (quoting Diversified Indus. Dev. Corp. v. Ripley, 82 Wash.2d 811, 814-15, 514 P.2d 137 (1973)). A justiciable controversy involves
"(1) ... an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive."
Id. It is the fourth requirement that concerns us here. A declaratory judgment "has no direct, coercive effect." 15 Karl B. Tegland, Washington Practice: Civil Procedure § 42:1 (2d ed. 2009). Moreover, the decision to enforce provisions of a controlled substances act is left to the discretion of agencies overseeing the statute. See Heckler v. Chaney, 470 U.S. 821, 824-25, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (noting that the secretary of the federal Food and Drug Administration would not exercise discretion to enforce alleged violations in the acquisition and use of lethal substances for a state's execution proceedings). The Appellants have not established that any declaratory judgment in this matter would produce a final and conclusive determination. Such a judgment would look very much like an advisory opinion, which we issue only in rare circumstances. To-Ro Trade Shows, 144 Wash.2d at 416, 27 P.3d 1149.
¶ 33 Below, the Appellants attempted to distinguish Heckler by noting that the court there explained that an agency's decision not to enforce the laws it oversees is discretionary. CP at 1901. Here, in contrast, the Appellants are "not attempting to compel [an agency] to enforce its own regulations; [they are] seeking declaratory and injunctive relief for violations of federal and state law." Id. But we cannot see what purpose a judgment declaring a violation would serve when enforcement of the alleged violations remains in the discretion of the agency, and no party is bound to act in accord with such judgment. "The court may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding." RCW 7.24.060. We invoke our discretion to so refuse such a judgment here.[9]
¶ 34 In addition, we decline to issue a declaration that the Department's actions violate the state UCSA or the federal DAPCA in the absence of a showing that either the UCSA or the DAPCA overrides statutory law governing executions. A Washington statute directs correctional facilities to carry out executions. RCW 10.95.180. Washington law chooses lethal injection as the primary method of execution, and a sentence of death in the federal system is to be carried *272 out "in the manner prescribed by the law of the State in which the [death] sentence is imposed." 18 U.S.C. § 3596(a). Thus, both our state legislature and Congress have approved a method of execution that requires the use of substances otherwise classified as controlled substances under state and federal laws. Those laws make no mention of a government's need to secure a prescription in order to carry out its execution duties. It is a dubious proposition to conclude that either our legislature or Congress intended that the policy codified in state and federal controlled substances actspreventing drug abuseapplies to execution procedures. As one court has observed, such a conclusion "would risk frustrating the [state legislature's] considered decision to adopt execution by lethal injection as the primary method of execution." Abdur'Rahman v. Bredesen, 181 S.W.3d 292, 314 (Tenn.2005) (refusing to enjoin state's execution practices based on DAPCA). We decline to grant a declaratory judgment on this matter.[10]

D. Is the Appellants' Constitutional Challenge Moot?
¶ 35 The posture of this case changed significantly on March 2, 2010, when the Department filed a motion to dismiss the Appellants' constitutional challenge to the three-drug execution protocol and all related issues[11] as moot in light of the Department's adoption of a one-drug lethal injection protocol. On March 8, 2010, the Department adopted its revised lethal injection protocol, which now provides for use of a single drugsodium thiopental.
¶ 36 This change in policy goes to the crux of the Appellants' constitutional challenge, which focuses on the risk of a very painful death if the sodium thiopental does not fully produce unconsciousness when the pancuronium bromide and potassium chloride take effect. II VRP at 282. The Department argues that the Appellants' claims are now moot because execution by sodium thiopental alone does not pose this risk, so "there is no cruel punishment," ergo "no constitutional violation." Reply to Resp. to Mot. to Dismiss as Moot at 3.
¶ 37 Issues are moot when the court can no longer provide effective relief. In re Pers. Restraint of Mattson, 166 Wash.2d 730, 736, 214 P.3d 141 (2009); In re Cross, 99 Wash.2d 373, 376-77, 662 P.2d 828 (1983). In a similar case, the Sixth Circuit Court of Appeals held that a challenge to Ohio's three-drug lethal injection protocol became moot upon that state's adoption of the one-drug protocol. Cooey v. Strickland, 588 F.3d 921, 923 (6th Cir.2009). The same conclusion must follow here: the Appellants' constitutional *273 claim regarding the Department's use of three drugs in its lethal injection protocol is moot in light of the Department's abandonment of that protocol.
¶ 38 A question remains, however, as to whether the Appellants' constitutional challenge may be addressed to the 2010 one-drug protocol. It is true that the Appellants' evidence at trial raised concerns about the maladministration of sodium thiopental through, for example, faulty siting of intravenous lines (IV) or deficient training. See, e.g., Br. of Appellants at 11-15 (citing to testimony discussing execution team's training on IV siting). On its face, this concern would appear to apply equally to the 2008 protocol and the 2010 protocol. But, in the context of the trial below, the Appellants' concern was that such maladministration would result in pain because the condemned inmate would not be sufficiently unconscious when he or she received the dose of pancuronium bromide and potassium chloride. See, e.g., id. at 11 (citing III VRP at 334) (noting that expert testimony at trial described how the protocol as implemented "creates a substantial risk of maladministration of the first drug, sodium thiopental, which risks `the inmate being conscious for the delivery of the pancuronium bromide'" (quoting VRP at 334)). It is apparent, too, from the trial court's findings of fact below that the court believed the operative inquiry was the extent to which the prisoner might be conscious enough to feel pain as a result of the pancuronium bromide or potassium chloride. See, e.g., CP at 3196 (Finding of Fact 24) (noting the Appellants asserted that several factors "can compromise the delivery of an adequate dosage of sodium thiopental or the consciousness of the inmate"); CP at 3202 (Finding of Fact 54) ("The proper insertion of the intravenous line... ensures the three grams of sodium thiopental will be introduced into the inmate's circulatory system. The Plaintiffs' expert agrees, however, that even if an error results in some of the sodium thiopental leaking into the surrounding tissue rather than the vein, the introduction of less than three grams of sodium thiopental will likely still be sufficient to render the person unconscious." (emphasis added)).
¶ 39 We also recognize that some evidence at trial established a degree of pain associated with a maladministered single drug, such as swelling or burning around an improperly inserted IV site. See, e.g., CP at 3202 (Finding of Fact 52) (noting that "[i]f sodium thiopental is injected into the subcutaneous tissue, it will cause discomfort of a burning sensation"). But again, such evidence was elicited in the context of a challenge to the three-drug protocol and concerned the extent to which it is possible to ensure that the condemned inmate receives a sufficient quantity of sodium thiopental to render him unconscious before delivery of the other two drugs. The evidence was not presented to show that the swelling or burning of maladministered sodium thiopental alone presented a constitutionally impermissible risk of pain. See, e.g., II VRP at 344-45, 353-54; III VRP at 433-37, 442, 497-98, 521-22; IV VRP at 691. There was no evidence presented by the Appellants at trial, nor is any argument made on appeal, that pain associated with the maladministration of sodium thiopental rises to the level of cruel or unusual punishment. In short, there has been no trial on the constitutionality of the new one-drug protocol, and we cannot hold such a trial on appeal.
¶ 40 In light of the foregoing, the record in this case provides no basis for the constitutional issues raised by the Appellants. Cf. Mattson, 166 Wash.2d at 736, 214 P.3d 141. We therefore grant the Department's motion to dismiss the Appellants' constitutional claims and related issues and do not reach their merits.
¶ 41 Given our resolution of this case, Brown's stay of execution entered by this court on March 12, 2009, pending the decision in this matter is lifted.[12]

CONCLUSION
¶ 42 It is the policy of the State of Washington to execute inmates condemned to death by use of lethal injection, now under a *274 one-drug protocol. The legislature properly delegated authority to the Department to develop and implement the death penalty protocol. And we decline to issue a declaratory judgment invalidating the Department's use of the substances involved in lethal injection on the basis of state and federal controlled substances acts. As a result of the Department's adoption of a one-drug lethal injection protocol instead of three-drug protocol on March 8, 2010, the Appellants' constitutional challenge to the protocol is moot. Accordingly, though this lawsuit is timely brought, we affirm the trial court's dismissal of the Appellants' nonconstitutional claims and dismiss their constitutional claims as moot.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, CHARLES W. JOHNSON, GERRY L. ALEXANDER, RICHARD B. SANDERS, TOM CHAMBERS, MARY E. FAIRHURST, JAMES M. JOHNSON, Justices, and TERESA C. KULIK, Justice Pro Tem.
NOTES
[1] When originally retained, this matter also included a dispute about deposition costs. The Department agreed that the costs awarded for transcripts should be vacated and that issue is no longer before us. See Opening Br. of Appellant Stenson at 49-50 (arguing that the trial court erred in awarding the Department deposition costs); Resp'ts' Mot. to Dismiss as Moot the Claims that the Three-Drug Protocol is Unconstitutional at 10 n.3 (agreeing that costs should be vacated).
[2] Appellants Brown and Gentry adopted Appellant Stenson's briefing before this court as their own. Br. of Appellants Brown and Gentry at 1. Stenson's opening brief will therefore hereinafter be cited as Brief of Appellants.
[3] The temporary stay affected only Brown. Order, supra. Gentry's execution was previously stayed by a federal court, and Stenson's by a Clallam County court.
[4] The superintendent testified at trial as to the length of the tubing as 14 1/2 feet. IV VRP at 618. The length is not included in either the 2008 or 2010 written protocol. The Department has not indicated any intention to use a different tubing length with the new protocol.
[5] Gentry's sentence became final in 1995. State v. Gentry, 125 Wash.2d 570, 888 P.2d 1105, cert. denied, 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 79 (1995). Brown's sentence became final in 1998. State v. Brown, 132 Wash.2d 529, 940 P.2d 546 (1997), cert. denied, 523 U.S. 1007, 118 S.Ct. 1192, 140 L.Ed.2d 322 (1998). Stenson's sentence became final in 1998. See State v. Stenson, 132 Wash.2d 668, 940 P.2d 1239 (1997), cert. denied, 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998).
[6] "[A] cause of action accrues when the injured party knows or should know, by the exercise of due diligence, all the facts necessary to establish the elements of the party's claim." In re Estates of Hibbard, 118 Wash.2d 737, 743 n. 15, 826 P.2d 690 (1992).
[7] Appellants were subjected to the penalty of death only after a criminal trial attendant with all due process afforded to criminal defendants, and their convictions and sentences were upheld on appeal.
[8] The Appellants take issue with the superintendent's ability to informally supplement the death penalty protocol. Br. of Appellants at 29-30. To the extent this line of argument is intended to show that the legislature has improperly delegated authority directly to the Department's superintendent rather than to the secretary, it must also fail. Appellants cite no authority that prohibits the legislature from delegating authority consistent with the requirements of Powell to a department employee who is subordinate and accountable to the secretary.
[9] We are aware that a federal district court in a Missouri case opined that the apparent resignation of a Washington Department of Corrections employee over alleged violations of controlled substances laws suggests the Department would likely adhere to a declaratory judgment. Ringo v. Lombardi, ___ F.Supp.2d ___, ___, 2010 WL 750055, at *4 (W.D.Mo.2010) (discussing facts surrounding these execution proceedings). Citing Franklin v. Massachusetts, 505 U.S. 788, 803, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), the Ringo court was satisfied that it could assume an agency would comply with a declaratory judgment finding violations of the federal DAPCA in Missouri's lethal injection protocol. Ringo, ___ F.Supp.2d at ___, 2010 WL 750055, at * 4. We believe such an assumption is too tenuous a basis on which to rest a judgment.
[10] In any event, we are not convinced the Department is in violation of the acts at issue. The Department's activities appear to be exempted from Washington's UCSA. RCW 69.50.506(c) states that "[n]o liability is imposed by this chapter upon any authorized state, county or municipal officer, engaged in the lawful performance of his duties." Further, it is not clear that the Department is in violation of the federal DAPCA, which exempts from civil or criminal liability state officers "lawfully engaged in the enforcement of any law or municipal ordinance relating to controlled substances." 21 U.S.C. § 885(d). We further note that, according to the Department, a complaint regarding a violation of the UCSA and the DAPCA was previously made with the state Department of Health (DOH) and the federal Drug Enforcement Agency (DEA), respectively, alleging that the Department's use of controlled substances for execution violated state and federal law. Wash. Supreme Court Oral Argument, Brown v. Vail, No. 83474-1 (Mar. 18, 2010), at 32 min., 02-20 sec., audio recording by TVW, Washington State's Public Affairs Network, available at http://www.tvw.org. The DEA declined to investigate the matter, and the DOH determined there was no violation of the law. Id.
[11] When originally retained, this appeal challenged several of the trial court's rulings regarding discovery and trial management, particularly with regard to the trial court's decision not to allow discovery about past executions and execution teams. Br. of Appellants at 3-4. However, these rulings impacted the Appellants' ability to build their constitutional challenge, id. at 31-35, and are therefore linked to the Appellants' constitutional claim; because the constitutional claims are moot, a challenge to these rulings is also moot. In any event, the Appellants failed to preserve their argument regarding the trial court's rulings. Although they assign error to these rulings, Appellants have offered no briefing or argument as to why the rulings were in error. A party that offers no argument in its opening brief on a claimed assignment of error waives the assignment. Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 809, 828 P.2d 549 (1992).
[12] Stenson's stay and Gentry's stay were issued by a county court and a federal court respectively, thus this court is not in a position to act on those orders.